HAMITER, Justice.
Mrs. Concordia Lorenz Davis, a widow, instituted this suit in forma pauperis to recover a judgment condemning Stephen J. Radoste to pay her the sum of $24,616.99 and, further, ordering him to return one set of table silverware of the value of $100 and some pieces of jewelry worth $47.
Allegedly,' the first mentioned amount represents funds which plaintiff entrusted to defendant, without any intention of parting title thereto, "so that same would be subject to petitioner’s use and control”, he having obtained possession of $20,000 thereof on March 20, 1950 and of the remaining $4,616.99 on October 22, 1951. Alternatively, in the event it be held that title to the funds was conveyed, plaintiff averred that the transactions constituted an illegal donation omnium bonorum, she having failed to reserve assets of a sufficient amount for her subsistence. The silverware and jewelry, she further alleged, was borrowed from her by defendant.
. Denying in his answer that he is indebted .to plaintiff, and praying that the suit be dismissed, defendant affirmatively averred .that on the respective dates recited above he obtained from her $15,000 as a remunerative donation for services. rendered and $2,500 under an agreement whereby she would receive during her lifetime all rentals from certain real estate owned by him. Further answering defendant admitted "that petitioner turned over to respondent a few trinkets to sell, having no appreciable value, which respondent will return to petitioner upon request; that the set of table silver was loaned to respondent and is the property of petitioner.”
After a trial of the merits plaintiff was granted a judgment for the sum of $24,616.-99, subject to a credit of $947. In support of the award the judge assigned no written reasons; however, counsel agree that it was predicated on a conclusion, announced orally, that the transactions constituted a donation omnium bonorum and, hence, were null and void. Additionally, the judgment ordered defendant to deliver to plaintiff “one set of table silver, two wedding rings, one ear ring, one gold stud and two silver napkin rings, being property of the plaintiff in possession of the said defendant.”
From the judgment both plaintiff and defendant appealed devolutively.
For some years previous to 1946, according to the record, plaintiff lived alone in a small double cottage bearing Municipal Numbers 714-716 Verret Street in the Algiers section of the City of New Orleans, it being one of a group of three buildings located at the corner of Verret and Opelousas Streets (the others, Numbered 601 and 605 Opelousas Street, were used as stores) which she had inherited from her *165 deceased husband. In the early part of 1946, while at the age of 70 years and in poor health, she was the recipient of some small favors rendered by defendant, a 26 year old clerk in one of the stores located on her property. This led to an agreement whereby she, defendant and his sister would live together; and pursuant thereto she moved into a dwelling then occupied by the others.
After staying there approximately a month, and the defendant having sold his house, the three removed to plaintiff’s Verret Street property which, during such period, had been renovated and converted into a single cottage. In this home they resided family like, with all sharing household expenses, until about 1948 when defendant went to Philadelphia, Pennsylvania, for some schooling and his sister left because of plaintiff’s attitude about her “going out at times.” While at school, where he remained for about a year, defendant received from plaintiff much of the money needed to defray his expenses. On his return to New Orleans their living together at plaintiff’s home was resumed (except as to the sister), and the arrangement continued until about May, 1951 when defendant went elsewhere to reside.
Meanwhile, on October 25, 1947, plaintiff executed a will in which she bequeathed to defendant the store building at 601 Opelousas Street and to her three nieces and a nephew residing in California (her only relatives) the remainder of her property, particularly the other store building and the Verret Street cottage.
On February 8, 1950, plaintiff conveyed to the H. G. Hill Stores Realty Company, Inc., by a cash sale, all of the above described real estate. Under the terms of the deed, however, she reserved for the remainder of her natural life, the usufruct of the Verret Street cottage, it to be free and clear of all taxes and insurance but vendor to make all ordinary repairs necessary to maintain the property as a residence. The net proceeds realized from the sale amounted to about $28,000, and she deposited them to her account with the Algiers Homestead Association.
Approximately 42 days later (March 20, 1950) plaintiff withdrew $20,000 from that account by means of two checks of $10,000 each. Her testimony is that on such date she cashed the two checks, delivered the entire proceeds thereof to defendant at the Whitney Bank in New Orleans, and then accompanied him to the Hibernia Bank in that city where he placed the money in his safety deposit box. The defendant testified that she gave him only $15,000 on that date — $5,000 at her home and $10,000 at the Whitney Bank; however, he agreed that the money received went into his deposit box, as plaintiff stated.
On1 October 4, 1950 the defendant purchased a piece of rental property on South Salcedo Street in the City of New Orleans for $14,700. He stated that the entire consideration was paid by cash (no check), part *167 of which had been given him by plaintiff and the remaining portion was some of the proceeds from the sale of his home in 1946; and that shortly after making the purchase he spent nearly $6,000 in repairing and renovating the property.
On October 22, 1951, according to the records of the Algiers Homestead Association, plaintiff withdrew the balance in her account there, or $4,616.99; and such money, to the knowledge of the secretary-treasurer of that Association who was also plaintiff’s confidential advisor, represented all the assets she then possessed. These funds, she stated, were immediately delivered to defendant. The latter alleged and testified, however, that he received only $2,500 of the withdrawn sum.
Also, on October 22, 1951 plaintiff made a new will, revoking all others and leaving to defendant “all the property, real, personal or mixed of which I may die possessed.”
And on the same date the defendant executed an instrument reading:
“State of Louisiana Parish of Orleans
“Personally came and appeared before me Steve Radoste, who being duly sworn according to law, desposes and says:
“That he is the owner of the property Nos. 121-121% and 123 and 123% South Salcedo Street, New Orleans, La., that he does hereby request and authorize Mrs. Concordia L. Davis of 714 Verret Street, New Orleans 14,- La. to collect all rents from the above described property during her life time.
“Steve J. Radoste
“Subscribed and sworn to before me on the 22nd day of October, 1951.
“Myrtis C. Broussard
Notary Public”
Notwithstanding the request and authorization contained in the quoted affidavit defendant collected all rents from his South Salcedo Street property that came due prior to the institution of this suit on April 21, 1952. Subsequently, and following receipt by the tenants of letters from counsel for plaintiff and defendant (dated May 22, 1952 and May 29, 1952, respectively, and making reference to> the quoted instrument) plaintiff, through an agent, has been collecting and retaining the rentals. For some of these retained rentals credit was allowed defendant on the judgment rendered by the district court in plaintiff’s favor.
Also, prior to the suit’s institution, specifically on February 29, 1952, plaintiff was compelled to borrow from the Whitney National Bank of New Orleans the sum of $100 .for use in taking care of her household and medical expenses, she then having been practically penniless. In this connection, and about that time, defendant attempted to obtain for plaintiff an “Old Age Pension” from the Louisiana Public Welfare Department. The mentioned loan *169 was repaid by her in June, 1952 (following the filing of the suit) with rents collected from defendant’s property.
The first question presented herein, being exclusively one of fact, is whether plaintiff turned over to defendant a total of $24,616.99, as she stated, or only $17,500, as he testified. The trial judge resolved it in plaintiff’s favor, and we cannot say that he manifestly erred in his resolution. Especially corroborative of plaintiff’s testimony are her cancelled checks by which funds in the first amount were withdrawn from the Algiers Homestead Association (they bear the respective dates on which defendant admits that the deliveries were made) ; and it does not appear that she otherwise disposed of or redeposited any portion of the money.
Next to be determined, and the most seriously contested issue in the case, is whether plaintiff, as she principally contends, merely entrusted or lent the funds to defendant; or whether she donated them, intending to part title thereto.
Defendant argues in this court that the deliveries effected a donation; and, further, that it was not reprobated by LSA-Civil Code Article 1497, because his affidavit of October 22, 1951 constituted a binding assignment of rentals sufficient for her subsistence. To quote from the supplemental brief of his counsel: “ * * * Since plaintiff parted with title to the money, the affidavit of October 22, 1951 can mean only one thing, and that is that the rentals were being assigned so that plaintiff would have ample subsistence for the rest of her life. As she will receive $205.00 a month, or $2460.00 a year, she need only live 7 years to be fully reimbursed, and almost three years of that period will have elapsed when this judgment becomes final.”
As a witness in her own behalf the plaintiff was not particularly impressive. At the time of the trial she was 76 years of age; she was under the treatment of a physician for arteriosclerosis involving the brain and for other ailments; and apparently she was very reluctant to discuss her past relations with the defendant. However, throughout her testimony she insisted that she merely made a loan of the money; and her reason for so favoring the defendant was: “ * * * I thought of him like a son. I had no children, you understand. * * * I trusted him with the money to go in some business, and that he would do right by me in my old days.”
And some corroboration of plaintiff’s testimony is contained in the record. The notary, Miss Broussard (a friend of defendant for many years, but who was in no manner connected with plaintiff), testified that when he signed the deed to the South Salcedo Street property defendant told her that he had borrowed the money to make the purchase. Again, a Mr. Boudreaux (with whose family plaintiff eventually went to live) testified that in a conference (held after the filing of *171 suit and at which he, plaintiff, defendant and others were present) the defendant “told Mrs. Davis that it was not necessary for her to sue him in order to get her money; that all she had to do was get a lawyer or some friend of hers together, and that he would have gladly returned her money to her without entering a suit against him.” Then, too-, plaintiff’s making of a will on the day she turned over the last of her assets to defendant would tend to indicate that the deliveries were intended as loans, for if gifts were contemplated the execution of a will at that time would, seemingly, have been a vain and useless formality.
On the other hand defendant’s testimony, to the effect that the funds were delivered to him as an outright donation, does not appear to be supported by any other evidence.
But even if the deliveries amounted to a donation, and assuming that they did, it was null and void for the reason that plaintiff, as is conclusively shown by the record, failed to reserve to herself assets sufficient for her subsistence. LSA-Civil Code Article 1497, Ackerman v. Larner, 116 La. 101, 40 So. 581, Welch v. Forest Lumber Co., 151 La. 960, 92 So. 400, Kirby v. Kirby, 176 La. 1037, 147 So. 70, Litton v. Stephens, 187 La. 918, 175 So. 619.
Of course, as pointed out above, the defendant maintains that the donation was not violative of the cited codal provision and jurisprudence in view of his having executed an affidavit which (he contends) assigned and guaranteed to her an annual-income of more than $2,000’ for the remainder of her life and the legal effect of which was “to constitute a real right against defendant’s property which passes-with the sale of his land.”
We do not so construe the instrument. It, the provisions thereof disclose,, is nothing more than a power of attorney, revocable at the will of the defendant, the affiant having merely said therein that with reference to his South Salcedo Street property “he does hereby request and authorize” the plaintiff “to collect all rents from the above described property during her lifetime.” The instrument contains no-language whatever from which one might conclude that it was intended to operate as an assignment of rents or a rent charge. Nothing is stated therein about assignments, the granting of an irrevocable authority to collect, or the existence of a valid and sufficient consideration. Nor does it show whether the rentals were to-be received by plaintiff on a “gross” or a “net” basis. Moreover, for approximately six months following execution of the affidavit (until after this suit was filed) defendant himself evidently interpreted it as a mere power of attorney — not a rent charge. During that period he collected and retained all rentals.
Subsequent to the cause’s submission-here for decision the defendant filed a document entitled “Judicial Admission *173 of Defendant-Appellant”. Among other things it recites:
“That, during the oral argument of this case one of the Members. of the Court asked counsel .for defendant-appellant if his client was willing to agree that any judgment rendered herein would provide that the agreement of October 22, 1951 would operate to prevent appearer from making any disposition, mortgage or alienation of the property on S. Salcedo Street during the lifetime of plaintiff in order that plaintiff might be assured that defendant would carry out. his agreement to take care of her for the rest of her life.
“Appearer now judicially consents that any judgment rendered herein shall contain an express decree that his real estate on S. Salcedo Street shall, during plaintiff’s life, be impressed with a real charge or obligation so that all the rents and income therefrom shall be paid directly by the tenants to her, and, if necessary to accomplish that purpose plaintiff may execute the leases on said property to- endure during her life; that Art. 2017 [LSA-]C.C. provides that the rental agreement involved here operates as a real obligation and passes with the real estate. Plaintiff is receiving gross rentals, and defendant must pay taxes, insurance and repairs.”
By this document the defendant, in some respects, has changed his originally assumed position. For example in his answer he pleaded:
“ * * * that the donation of $15,000.00 was not a gratuitous donation but was a remunerative donation made to your respondent for services rendered to petitioner, as often admitted by petitioner to your respondent.
* * * * * *
“That on or about October 21, 1951, when your respondent received from petitioner the additional sum of $2500.00, it was expressly agreed and understood between petitioner and respondent that petitioner was to receive from respondent all of the rentals of the real estate then owned by your respondent, 121-1211/2, 123-123y2 South Salcedo Street, New Orleans, Louisiana, during petitioner’s lifetime, that, in conformity with this understanding, respondent executed the affidavit annexed to the petition herein; that it was agreed and understood between petitioner and respondent that the rents referred to in said affidavit were to be the net rents.
?i* ^
“Your respondent specially shows that, while petitioner has no lien against your respondent’s property, it is not respondent’s intention to dispose of said property for the reason that your respondent intends to carry out to the letter his agreement with petitioner which requires the net rentals of said real estate to be received by petitioner during her life time.”
But irrespective of the change of position the belated document can have no *175 influence with respect to a determination of the issues above discussed. It simply operates to indicate the defendant’s present willingness for the rendition of such a judgment as this court would be compelled to render should it conclude that the 1951 affidavit constituted an irrevocable rent ■charge predicated on a valid and sufficient consideration. However, as pointed out above, we are unable to so conclude.
Defendant also pleaded that plaintiff’s acceptance of the rentals after the suit’s filing operated as “an estoppel and complete bar to her receiving the relief prayed for in these proceedings.” But this plea overlooks the theory on which plaintiff has been claiming and collecting the rents. Her primary contention has always been (and it is now) that there was no donation, she having merely lent the money to defendant (there is considerable evidence in support of the contention); and that she is entitled to collect the rentals and apply them on defendant’s indebtedness to her. Therefore, she is not estopped to deny that there was a valid donation. The defendant, however, should have credit for all rentals received by plaintiff. The judgment, as before shown, made allowance for those collected and retained by her prior to its rendition. As to any so received subsequently defendant’s rights will be reserved.
For the reasons assigned the judgment appealed from is affirmed at the costs of the defendant, reserving to him the right to claim and receive further credits as set forth hereinabove.
FOURNET, C. J., concurs in the decree.